De Davis REPTA, Plaintiff,

v.

OREGON ARENA CORPORATION, Defendant.

No. CV 97–1797–AS.

United States District Court, D. Oregon.

June 21, 1999.

Hank James McCurdy, Dobbins McCurdy & Yu LLP, Portland, OR, for De Davis Repta.

Thomas V. Dulcich, Schwabe Williamson & Wyatt, Portland, OR, for Oregon Arena Corp.

## ORDER

PANNER, District Judge.

■ Magistrate Judge Donald C. Ashmanskas filed his Findings and Recommendation on May 12, 1999. The matter is now before me. *See* 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b). No objections have been timely filed. This relieves me of my obligation to give the record *de novo* review. *Lorin Corp. v. Goto & Co., Ltd.*, 700 F.2d 1202, 1206 (8th Cir.1983). *See also Britt v. Simi Valley Unified School Dist.*, 708 F.2d 452, 454 (9th Cir.1983). I find no error. Accordingly, I ADOPT the Findings and Recommendation of Magistrate Judge Ashmanskas.

Defendant's motion (# 51) for partial summary judgment on the issue of punitive damages under Title VII is denied. Defendant's motion (# 63) to strike is denied with regard to the affidavit of Sal DiGiacomo and is granted with regard to the portions of the affidavits of Hans Feyen and Sal DiGiacomo.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

ASHMANSKAS, United States Magistrate Judge:

Defendant Oregon Arena Corporation ("Defendant") has filed its second motion for summary judgment. The sole issue before the court at this time is whether plaintiff De Davis Repta ("Plaintiff") is able to establish a claim for punitive damages under the 1992 amendments to Title

VII of the Civil Rights Act of 1964 (42 U.S.C. § 1981(a))("Title VII").

## BACKGROUND

Plaintiff was hired by Defendant as a part-time "guest attendant" in September 1995. In 1996, Plaintiff was scheduled to work a George Strait concert. Originally, Plaintiff was assigned to a position adjacent to the stage. She was subsequently reassigned to a position 20 to 30 feet from the stage. The reassignment was made at the request of the promoter who required all stage attendants to be males. Plaintiff complained about the reassignment to Kandis McClelland, guest attendant supervisor, and Mike Kolaski, guest services manager. While Plaintiff may have been "trimmed" early from the concert because she was not working a central location, there is no evidence that she suffered a loss of income as a result of the reassignment.

On February 28, 1997, Plaintiff was scheduled to work a high school wrestling championship in the morning and early afternoon, a gun show in the late afternoon and a Trail Blazer game at night: a total of 17 hours. Plaintiff worked her hours at the wrestling meet and then reported to the promoter of the gun show (the "Promoter") for her assignment. She was advised that she was not needed by the Promoter and was reassigned to the wrestling meet by her supervisor. Plaintiff learned within a few hours that the Promoter had requested only male guest attendants and that a male guest attendant had been reassigned to fill her assignment at the gun show. Plaintiff completed her assignment at the wrestling meet and worked the first half of the Trail Blazer game before she asked, and received permission, to go home early. As a result of leaving three hours early, Plaintiff lost $18.00 in wages. Plaintiff worked her normal hours the next day.

Plaintiff complained about her reassignment to a number of supervisors. Defendant conceded that the reassignment was based solely on her sex and was done at the request of the promoter. Defendant expressed disappointment and dissatisfaction with the promoter's request for male guest attendants and apologized to Plaintiff for the reassignment.

Ben Pearl, guest services manager and Plaintiff's acting supervisor the day of the gun show, was aware that the Promoter required male only guest attendants as early as February 1994. In 1995, Pearl assigned two female guest attendants to the gun show despite the Promoter's request and was reprimanded by both Judy Henry–Pierce, senior event coordinator and his supervisor, and Mike Enoch, then general manager of facility operation. Pearl complained to Enoch about the request and stated that he felt it was improper for him to comply with the request. Enoch responded by saying something like "give the event coordinators what they want and it won't be a problem."

Ben Pearl complied with the "males only" request in February 1996 but again expressed his concern for the discriminatory policy to Monte Joe Vaughn, senior event coordinator and his supervisor, and Amy Westlund, another guest services manager. Sometime in 1996, both Henry–Pierce and Debbie Chitwood, director of facility services, advised Jim McCue, vice president in charge of sales and marketing, of the Promoter's "males only" policy and indicated that they were concerned about complying with the request. McCue indicated that he did not do anything in response to the complaint because the request had not been made with regard to any of the shows that he was involved with.

Prior to the gun show in 1997, Vaughn told Pearl and Lonnie Hamon, another guest services manager, not to schedule women to work the gun show. Pearl passed this information on to Westlund. While it is clear that the "males only" requirement was written in the manifest, or work order, in 1994, 1995 and 1996,

there is some dispute about whether that requirement was included in the 1997 manifest. Vaughn testified that he eliminated the requirement to make sure that the gun show was not staffed in a discriminatory manner. Hamon testified that he saw a "no females" instruction on the 1997 manifest. In any event, after the incident with Plaintiff and the Promoter was resolved, Pearl remembers Vaughn saying "I told you guys not to staff any females for this show. Why can't you guys just do this? The promoter is really pissed off."

Defendants represent that the executives responsible for making policy decisions are J. Isaac, senior vice president; Jim McCue, vice president of sales and marketing; and Ron Woodbridge, general manager of facility operation. Woodbridge recently joined Defendant. His predecessor was Mike Enoch.

There is no evidence that either J. Isaac or Ron Woodbridge knew of the Promoter's "males only" request or that the event coordinators and guest service managers were complying with the requests. Hamon has testified that, after Plaintiff's incident and before instructions not to use e-mail to discuss the incident, either Isaac, McCue or Woodbridge sent an e-mail stating that "we're in the business of making sure we do what the promoter says." Hamon thought that this e-mail precipitated the restrictions of future e-mail use. Woodbridge stated in his deposition that, based on the information available to him, he concluded that Plaintiff was reassigned because the Promoter preferred men.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure allows the granting of summary judgment:

> if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed.R.Civ.P. 56(c). "[T]he requirement is that there be no *genuine* issue of *material* fact." *Anthes v. Transworld Systems, Inc.,* 765 F.Supp. 162, 165 (D.Del.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986))(emphasis in original).

The movant has the initial burden of establishing that no genuine issue of material fact exists or that a material fact essential to the nonmovant's claim is absent. *Celotex v. Catrett,* 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the movant has met its burden, the onus is on the nonmovant to establish there is a genuine issue of material fact. *Id.* at 324, 106 S.Ct. 2548. In order to meet this burden, the nonmovant "may not rest upon the mere allegations or denials of [its] pleadings," but must instead "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute could affect the outcome of the case. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Factual disputes are genuine if they "properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. On the other hand, if after the court has drawn all reasonable inferences in favor of the non-moving party, "the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted).

## PRELIMINARY PROCEDURAL MATTERS

■ Defendant moves to strike the affidavit of Sal DiGiacomo because Plaintiff failed to disclose him as a witness in her interrogatory responses. Plaintiff has presented evidence that she was not aware of the witness until after she responded to

Defendant's interrogatories. Furthermore, Plaintiff informed Defendant of the identity of the new witness and the content of his testimony in a timely manner. Defendant's motion to strike the affidavit of Sal DiGiacomo should be denied.

■ Defendant also moves to strike the portions of the affidavits of Hans Feyen and Sal DiGiacomo in which they represent that Defendant's senior management "probably" or "undoubtedly" knew of the practice of complying with promoters' discriminatory requests. Defendant contends that the information is not based on personal knowledge and does not constitute lay or exert opinion testimony.

The information supporting the deponents opinions, that as employees of Defendants, they knew that promoters requests should be complied with even discrimination was the end result, is within the personal knowledge of the deponents. The additional inference that Defendant's senior management must have known of the policy, is an inference to be made by the factfinder, not the deponents. Defendant's motion to strike the relevant portions of the affidavits should be granted.

## DISCUSSION

■ Title 42 U.S.C. § 1981a(b) provides in pertinent part: "A complaining party may recover punitive damages under this section against a respondent . . . if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual." The Ninth Circuit has held that proof of intentional discrimination, standing alone, is insufficient to warrant sending the issue of punitive damages to the jury. *Ngo v. Reno Hilton Resort Corporation*, 140 F.3d 1299 (9th Cir.1998). Instead, the Ninth Circuit has adopted a heightened standard for the imposition of punitive damages.

"An award of punitive damages under Title VII is proper where the acts of discrimination giving rise to liability are willful and egregious or display reckless indifference to the plaintiff's federal rights. In such circumstances, society has a strong interest in punishing the tortfeasor, and exemplary damages are most likely to deter others from undertaking similar actions. Punitive damages may not be awarded, however, where a defendant's discriminatory conduct is merely "negligent in respect to the existence of a federally protected right," since society's interest in punishing the tortfeasor is substantially reduced in such cases, and the deterrent effect of exemplary damages is likely to be much weaker. Thus, to be entitled to an award of punitive damages, the plaintiff must demonstrate that the defendant "almost certainly knew that what he was doing was wrongful and subject to punishment." "

*Id.* at 1304 (citations omitted.)

The two Ninth Circuit cases cited by the parties are good examples of the two ends of the spectrum. In *Ngo*, plaintiff, an Asian, was denied a medical leave of absence because the defendant had mistakenly classified her as a part-time employee. When Plaintiff returned to work, she was denied seniority and benefits that she would have earned but for the mistaken classification. Plaintiff presented evidence that her employer allowed a white employee a three-week leave of absence for her honeymoon even though she was not qualified for the leave. *Id.* at 1300–01.

The jury found in favor of the plaintiff on her race discrimination claim and awarded compensatory damages. However, the district court declined to submit the issue of punitive damages to the jury and the plaintiff appealed. *Id.* at 1300. The Ninth Circuit affirmed the trial court reasoning that:

"While the record clearly supports the jury's finding that Hilton discriminated against Ngo, it does not support an

award of punitive damages. Hilton acted negligently and perhaps even recklessly in denying Ngo's request for a leave of absence and discharging her: although Ngo had satisfied Hilton's leave requirements, the Human Resources Director who fired Ngo failed to determine accurately the length of her full-time employment, and Hilton's Employee Services Manager erroneously told Ngo her service at Bally's did not count toward her seniority at Hilton. * * * These acts do not, however, evince an evil motive or a conscious and deliberate disregard for Ngo's federally protected right against discrimination. To put it another way, negligent decision making and poor communication among managers may properly give rise to compensatory liability under Title VII, but they do not, without more, warrant punishment, nor would such acts be deterred by an award of exemplary damages."

*Id.* at 1304–05.

In *EEOC v. Wal–Mart Stores, Inc.,* 156 F.3d 989 (9th Cir.1998), the Ninth Circuit reversed a district court's withdrawal of the punitive damage issue from a jury. The plaintiff alleged that she was directly told by an interviewer that she would not be hired because of her pregnancy. The court also found evidence that the employer attempted to cover-up the true reason for her rejection by deliberately losing her interview file and by proffering patently false alternative grounds for not hiring plaintiff. The court found the evidence far more egregious than the facts presented in *Ngo* and concluded that a reasonable jury could find such evidence sufficient to show defendant exhibited a reckless disregard for plaintiff's federally protected rights. *Id.* at 992.

■ The action before the court falls somewhere in the middle of the spectrum created by *Ngo* and *Wal–Mart.* If the court were the ultimate factfinder, it is very likely that I would grant Defendant's motion. However, the court finds that Plaintiff has presented just enough evidence which, when viewed in the light most favorable to the Plaintiff, supports a denial of Defendant's motion for partial summary judgment on the issue of punitive damages.

There is no dispute that the Promoter's "males only" request was in place as early as the 1970's and that Defendant complied with the Promoter's request. Mike Enoch, an executive with policy-making authority, was advised of the "males only" request in 1995. At that time, he espoused what appears to be Defendant's policy: "give the event coordinators what they want and it won't be a problem." This policy was reiterated over the internet by another policy-making executive who indicated that "we are in the business of making sure we do what the promoter says." Viewed in the light most favorable to the Plaintiff, this evidence establishes that Defendant had a long-term policy of complying with promoter's discriminatory requests. The fact that Plaintiff was the first female guest attendant to complain about the policy or that Plaintiff was not dramatically damaged by the adherence to the policy does not lessen the offensiveness of the policy.

■ At least one other policy-making executive was aware of the "males only" request and of his staff's feelings that compliance with the request was discriminatory. In the face of this knowledge and the staff's concerns, McCue ignored the entire situation because it didn't involve one of his shows. McCue's conduct exemplifies a total disregard, if not a "hostile attitude" towards existing civil rights laws. The mere fact that Defendants had anti-discrimination policies in their employee handbook and their leasing agreements does not protect Defendant unless it makes at least a good faith effort to abide by them.

Defendant argues that as soon as they were aware of the discrimination of Plaintiff, they promptly admitted their wrong-

doing, apologized to Plaintiff and advised Plaintiff to bring complaint directly to management in the future. This statement is contrary to the evidence discussed above which establishes that Defendant's management was aware of the discrimination in 1995 and ignored it until it was forced to respond to Plaintiff's complaints in 1997. Additionally, despite the acknowledgment of their wrongdoing to Plaintiff, Defendant originally attempted to justify its actions by arguing that the gun show was over staffed. Now, it argues that safety concerns justified its actions. The court finds Defendants concern over the safety of its patrons admirable. However, it does not appear that the concerns were justified in this situation. Plaintiff, a Navy veteran was knowledgeable about guns and the safe use of guns. She was assigned to monitor an exit door and would not have been subject to confrontations with patrons entering the gun show with loaded weapons. Additionally, two security attendants were also on duty at the gun show and would have been available to assist Plaintiff if she became involved in an unlikely confrontation.

Finally, while the court is not of the opinion that there was an intentional, extensive cover up by Defendant, there is evidence that Defendant engaged in activities intended to protect them in the event of litigation. This included the destruction of both e-mail and hard copies of correspondence between Defendant's employees relating to Plaintiff's complaints. This destruction appears to have affected both privileged and nonprivileged documents. Furthermore, evidence exists, which viewed in a light most favorable to Plaintiff, supports the claim that relevant documents were altered after the incident occurred and before the documents were produced to Plaintiff.

The court finds that Plaintiff has presented evidence which could support a factfinder's determination that Defendant acted with reckless indifference with regard to Plaintiff's federal right to be free of discrimination based on her sex. Defendant's motion to dismiss should be denied.

## CONCLUSION

Defendant's motion (51) for partial summary judgment on the issue of punitive damages under Title VII should be DENIED. Defendant's motion (63) to strike should be DENIED with regard to the affidavit of Sal DiGiacomo and should be GRANTED with regard to the portions of the affidavits of Hans Feyen and Sal DiGiacomo.

DATED this 12th day of May, 1999.